Walter J. Yost v. Commissioner.
Yost v. Commissioner
Docket No. 19799.
United States Tax Court
1950 Tax Ct. Memo LEXIS 213; 9 T.C.M. (CCH) 370; T.C.M. (RIA) 50108; April 21, 1950
Claude A. Hope, Esq., 15 William St., New York, N.Y., and Mayer W. Aldridge, C.P.A., 208-212 Shepherd Bldg., Montgomery, Ala., for the petitioner. Newman A. Townsend, Jr., Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This proceeding involves deficiencies in income taxes for the years 1941 and 1943 in the amounts of $7,473.06 and $35,633.08, respectively. Of the issues raised by the petitioner, the only one submitted for decision is whether petitioner's wife was for income tax purposes a member of the partnership doing business as the Pine Plume Lumber Co. Petitioner filed his returns for the years 1941, 1942, and 1943 with the collector for the district of Alabama. Findings of Fact The petitioner, an individual residing in Montgomery, Alabama, was first employed in *214 1912 by the Pine Plume Lumber Co., then a corporation engaged in the manufacture and wholesale distribution of lumber in the state of Alabama, as sales manager. About 1915 he purchased a small amount of the corporation's stock and in 1922 he, W. F. Methvin, and one Whitstone, each became owner of one-third of the corporation's stock. About 1934 petitioner and Methvin acquired the stock held by Whitstone and thereafter until the dissolution of the corporation as of December 31, 1940, in connection with which the assets were distributed to and the liabilities were assumed by the stockholders, each owned 50 per centum of the corporation's stock. The corporation was reorganized about 1937 in a proceeding brought under section 77-B of the Bankruptcy Act. It recovered from its financial difficulties in about two and one-half years, or about December 1, 1940. At times prior to December 1940 petitioner's wife insisted that he give her an interest in the business, giving as a reason that she had contributed to its success and desired an independent income. Her understanding was that no interest could be transferred while the corporation was in financial difficulties. About December 1940, *215 after the corporate debts had been paid, petitioner decided to give his wife an interest in the business, and discussed the matter with Methvin. The discussion resulted in an agreement to dissolve the corporation, and the Goodwater Lumber Co., a corporation engaged in the lumber business and whose stock was owned in equal amounts by petitioner and Methvin, and transfer one-half of their interests in the assets of the Pine Plume Lumber Co. to their wives, respectively, for the purpose of forming a partnership with them, each to have a one-fourth interest therein. Tax savings were considered by petitioner and Methvin before they agreed to dissolve the corporations and form a partnership with their wives. On December 31, 1940, petitioner executed an instrument reciting that the Pine Plume Lumber Co. and Goodwater Lumber Co. had been dissolved and all of their assets transferred to him and Methvin, jointly, and containing the following provision: "Now, therefore, for and in consideration of the sum of One Hundred Dollars and other good and valuable considerations to me in hand paid by Eva F. Yost, receipt of which is hereby acknowledged, and for and in consideration of the advantages *216 accruing to the respective businesses by having the said Eva F. Yost as a partner in said businesses, and for and in conderation of the said Eva F. Yost having heretofore agreed to form a partnership with the undersigned and W. F. Methvin and Eva Methvin, and thereby to incur certain obligations and responsibilities in connection with said businesses, and in consideration of the loyal advice, support and comfort the said Eva F. Yost has given me in building up said business, and in further consideration of my desire to provide the said Eva F. Yost with an independent income and means of support and livelihood, I. W. J. Yst, do hereby grant, bargain, sell, transfer, assign and convey to the said Eva F. Yost all of my right, title and interest to and in an undivided one-fourth of the assets of the said businesses of the Pine Plume Lumber Company and Goodwater Lumber Company, being one-half of my interest therein." The instrument was not recorded. It was placed in a filing cabinet in the office of the Pine Plume Lumber Co. On December 31, 1940, petitioner and Methvin and the wife of each executed an instrument to form a partnership under the name of Pine Plume Lumber Co., hereinafter *217 referred to as the partnership, to commence January 1, 1941, and continue during the lives of the parties thereto unless dissolved prior thereto under the terms of the agreement. The instrument provides that each party thereto shall contribute his or her present interest in the assets of the Pine Plume Lumber Co., the assets so contributed to constitute the assets of the partnership; that the purpose of the partnership is to engage in the general lumber business; that profits and losses shall be shared equally; that the business shall be managed by petitioner and Methvin, they to receive, for their services, salaries to be agreed upon in addition to their share of the profits, the salaries to be paid before dividing the profits; that the wives agree to devote such time to the partnership as may be requested of them by the managing partners and to advise with them on partnership affairs from time to time and whenever called upon; that disbursements from the partnership's bank account shall be by checks signed by one of the managing partners, or by agreement of the managing partners, an employee with the countersignature of one of the managing partners, or by two designated employees *218 when agreed upon by the partners; that losses and profits shall be determined as of the close of each year; that the share of each partner in profits shall be placed to his or her credit and "paid out as agreed upon between the partners"; that in the event of death of a partner, the surviving partners shall have the right to continue the business until his or her interest was determined under the provisions of the agreement; that upon the death of one of the wives, her interest "shall thereupon become the property of the surviving spouse of the deceased partner absolutely" and the partnership shall continue in accordance with the terms of the agreement; that upon the death of petitioner or Methvin, his personal representative shall, upon notice, have the right to continue as a partner for a period of five years, and if the option is not exercised, the surviving partners shall have the right to purchase the interest of the deceased partner at the book value thereof at the time of his death and if the surviving partners do not exercise the option, the legal representative shall have the right to withdraw the interest of the deceased partner; that any partner shall have the right to terminate *219 the partnership on 60 day's notice and, if exercised, the other partner shall have the right to purchase his or her interest at its book value, the spouse of the retiring partner to have the right to make the purchase to the exclusion of other partners and if no purchase is made, the retiring partner shall have the right to sell to others or force a liquidation of the partnership, and that the business of the Goodwater Lumber Co., in case of its dissolution, shall be conducted as a partnership under the same name, the terms and conditions of that partnership to be the same as those specified in the instrument for the Pine Plume Lumber Co., provided that at any time its operations may be combined with those of the Pine Plume Lumber Co. The partnership agreement was not recorded in the public registry. However, the formation of the partnership was publicized in newspapers in Montgomery, Alabama. In October 1942 petitioner filed a gift tax return in which he reported a gift, at a value of $38,117.19, of one-half of his interest in the partnership on January 1, 1941, to his wife. Attached to the return was a balance sheet of the corporation on December 31, 1940, "adjusted for liquidation *220 purposes," reading as follows: ASSETS: Notes & Accounts Receivable
$231,900.38
Inventory Lumber
91,560.69
Prepaid Insurance
152.50
Plant & Equipment
18,111.53
Land
536.19
Due from Officers & Employees
8,883.51
Goodwater Assets Net
31,605.33
Total Assets
$382,750.13
LIABILITIES AND NET WORTH: Accounts Payable
$ 11,656.79
Notes Payable
178,032.22
Accrued Expenses
6,426.26
Overdraft
1,933.65
Accrued Taxes
32,232.44
Capital Stock, no par value
152,468.77
Total Liabilities and Net Worth
$382,750.13 In September 1943 the respondent notified petitioner that an examination of the return disclosed no deficiency in gift tax liability for 1941. Prior to the formation of the partnership, petitioner at times discussed business matters with his wife and considered her advice on employment problems. Upon a number of occasions customers and prospective employees were entertained in their home. Petitioner's wife had no business experience prior to her marriage to petitioner in 1920 or thereafter. After the partnership was formed petitioner continued to talk to her about business matters, but she did not assume any business responsibilities. She joined *221 in the execution of, or was named in instruments signed in 1941, 1942, and 1943, as a partner. On December 31, 1940, and on March 18, 1941, petitioner's wife participated in a meeting of the partners at which a resolution was adopted with respect to signatures on checks to be drawn on the bank account of the partnership, and borrowing money. She was never authorized to sign checks or notes of the partnership. The Pine Plume Lumber Co., prior to its dissolution, sold lumber purchased from others and of its own manufacture. It did not maintain a warehouse. The lumber it purchased from others was shipped directly to customers of the corporation. Petitioner was president of the corporation, and as such he was in charge of its activities, including financial matters and selling. Methvin was vice-president and operated a branch office in Atlanta, from which sales only were made. There was no change in the duties and responsibilities of petitioner and Methvin or the operation of the business after the formation of the partnership. Methvin had a heart attack in the summer of 1941 and was confined to his bed for three months. His doctor advised against active participation in the business *222 and one year later informed him that he would never be able to resume an active part in the affairs of the business. About the fall of 1942 Methvin notified petitioner of his intention to retire from the business on account of ill health. On December 18, 1942, petitioner and his wife agreed in writing to purchase in equal shares as of December 31, 1942, the interests of the Methvins in the partnership at a price equal to the book value thereof at the close of 1942, plus 25 per centum of the net profits derived from the sale of rough and finished lumber on hand on December 31, 1942, for the purpose of continuing the business as a partnership between themselves. The purchasers agreed to pay 25 per centum, but not less than $35,000, of the purchase price in cash and assumed joint and several liability to pay the remainder in eight equal quarterly installments, with interest, commencing March 1, 1943, and assumed the liabilities of the partnership. On December 31, 1942, petitioner and his wife executed an agreement in which they agreed to continue the business of the partnership under the same name, sharing profits and losses equally in accordance with their contributions; that petitioner *223 should receive for his services, in excess of time and effort of his wife, an amount to be agreed upon before the division of profits, and that all other terms of the partnership agreement entered into on December 31, 1940, should remain in full force and effect as part of the agreement. The agreement was not recorded in a public registry. In January 1943 notices were sent to lumber mills and journals and the bank that the business of the old partnership would be continued by petitioner and his wife. Petitioner and his wife paid to the Methvins under the agreement of December 18, 1942, over a period of about two years, cash in the amount of $157,924.69 out of earnings and assets of the business. In addition they paid during the same period liabilities of the old partnership in the amount of $131,462.21. In 1944 Methvin requested that notes, which he could discount at a bank, be given for unpaid installments. The notes given pursuant to the request were executed by the Pine Plume Lumber Co. and were signed by petitioner as managing partner. Petitioner managed all of the affairs of the new partnership without the performance of any services to it by his wife. It had from 120 to *224 140 employees in its plants. The Atlanta office was discontinued. The only capital contribution petitioner's wife made to the new partnership was the interest she had in the old one. At some undisclosed time while the new partnership was in existence, the wife's names appeared as a partner on letterheads of the business. The salary of petitioner, payable before any profits were available for distribution, was $25,000 in 1941, $24,999 in 1942, and $20,769.06 in 1943. A capital account was opened for petitioner's wife on the books of the partnership as of January 1, 1941, by credit entry of $22,735.68, to represent her capital contribution. No other credits were made in the account for capital contributions made out of the gift from her husband. She had no drawing account in 1941. During 1941 the drawing account of petitioner on the books of the partnership was charged about $22,500 for payments made to Whitstone on the stock petitioner purchased from him in 1934. The books did not show the purpose for which the payments were made. At the close of 1941 the net charges in the account, after deducting debits for salary, were $24,556.75. Upon being advised by petitioner that his wife *225 had assumed one-half of his debt to Whitstone when the partnership was formed and that at least $1,000 of his other withdrawals in 1941 were made for her account, the accountant for the partnership closed the account as of the close of 1941 by charging one-half of the balance to the capital account of petitioner and the remainder to the capital account of his wife. A drawing account was kept for petitioner's wife in 1942 and 1943. The books of the partnerships disclose withdrawals by the partners, as follows: 1941
1942
1943
Petitioner
$49,556.75
$33,626.05
$63,635.74
Eva F. Yost
5,230.00
53,367.92
W. F. Methvin
40,747.81
21,750.00
Eva Methvin
2,300.00
4,800.00
During the taxable years petitioner paid most of the household and living expenses of his family. His wife used some of her withdrawals for such purposes and other amounts to pay income taxes, to pay premiums on insurance on the life of petitioner, to help support an invalid brother and sister, to purchase antiques for the family residence, to pay for fancy groceries for parties, and make outside investments. The partnership filed returns on an accrual basis for the years 1941, *226 1942, and 1943, disclosing net income of $81,865.88, $249,493.41, and $114,922.74, respectively, distributable as follows: 1941
1942
1943
Petitioner [1]
$35,841.47
$81,122.60
$67,845.90
Eva F. Yost
10,841.47
56,123.60
47,076.84
W. F. Methvin [1]
24,341.47
56,123.60
Eva B. Methvin [1]
10,841.47
56,123.61
The books of the partnerships disclose the following balance sheets as of the dates shown: ASSETS
1-1-41
12-31-41
12-31-42
12-31-43
Cash on Hand and in Banks
$ 3,781.39
$ 12,530.25
$ 41,791.88
$ 20,730.75
Accounts Receivable and Notes Receivable
197,680.68
129,837.86
144,678.39
103,960.96
Inventories
105,993.19
153,842.50
161,626.10
200,259.31
Investments
0.00
1,480.00
1,480.00
1,480.00
Machinery & Equipment - After Accrued Deprecia-
tion
72,835.88
63,843.82
108,650.85
62,078.65
Other Assets
4,036.10
601.68
2,799.81
3,636.15
Land
536.19
536.19
2,500.00
2,500.00
Total
$384,863.43
$362,672.30
$463,527.03
$394,645.82
LIABILITIES
Accounts Payable
$ 16,917.71
$ 33,470.02
$ 9,152.18
$ 10,054.27
Notes and Mortgages Payable
247,155.31
150,847.78
115,296.65
169,086.08
Additional Federal Income Tax Due by Predecessor
Corp.
13,621.74
16,369.29
0.00
0.00
Accrued Expenses (Includes Tax)
11,889.85
10,360.43
7,013.38
5,021.73
Net Worth
90,942.74
151,624.78
332,064.82
166,845.86
Balances Due Former Partners for Interest in Part-
nership
0.00
0.00
0.00
43,637.88
Bank Overdraft
4,336.08
0.00
0.00
0.00
Total
$384,863.43
$362,672.30
$463,527.03
$394,645.82
*227 Petitioner and his wife filed returns for 1941, 1942, and 1943, on the cash basis in which they reported their distributive shares of the net income of the partnerships as shown in the partnership returns. The returns reported no income from the Goodwater Lumber Co. as a corporation or a partnership. The respondent determined that Eva F. Yost was not a member of the partnerships for income tax purposes and, accordingly, included in the income of petitioner the partnership profits reported by his wife. Petitioner's wife was not a member of the partnerships during the taxable years for income tax purposes. Opinion The issue is whether petitioner is taxable on his wife's distributive share of the profits of the partnerships created by the agreements entered into on December 30, 1940, and December 31, 1942. The point involved is whether the partnerships should be recognized for income tax purposes. The Court said in , concerning a like question that: "The question is not whether the services or capital contributed by a partner are of sufficient importance to meet some objective standard supposedly established by the Tower *228 case, but whether, considering all the facts - the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent - the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise. * * *" In an earlier case the same Court said that where, as here, an alleged partnership is challenged by an outsider, "* * * the question arises whether the partners really and truly intended to join together for the purpose of carrying on business and sharing in the profits or losses or both. And their intention in this respect is a question of fact, * * *." . Excepting an accountant, whose testimony was confined to entries made as of the close of 1941 to close out petitioner's drawing account, petitioner, and interested witness, was the only witness at the hearing on his behalf. Consideration will first be given to *229 the first partnership, which was in existence during the years 1941 and 1942, the latter year being involved because of provisions of the Current Tax Payment Act of 1943. The evidence does not disclose the qualifications of Methvin's wife to serve the partnership in any capacity, or the services she rendered to it, or the source of her contribution. Petitioner discussed business problems with his wife and took her advice into account when considering some matters of employment, but was aware that her comments were made without a background of business experience. Similar discussions took place after the creation of the partnership, yet petitioner did not regard them as a rendition of service to the partnership, for he testified that she did not assume any business responsibilities as a partner, or become active in the business or perform any services. That petitioner and Methvin did not enter into the venture with any expectation of assistance from their wives that would contribute to the success of the business, is otherwise shown by the provisions of the partnership agreement, which designate the husbands as managers of the business and assign no specified duties to the wives. *230 Petitioner testified that there was no change in the operation of the business after the partnership was formed or the duties and responsibilities of himself and Methvin. Thus, it is apparent that petitioner never intended to look to his wife as a partner who could or would render assistance falling within the classification of services to the business. The fact is evidence that the parties never intended that the admission of the wives as partners have a business purpose. It is alleged upon brief that for several years petitioner intended that his wife should have an interest in the business. The proof does not go that far. Petitioner's wife insisted at various times that she be given an interest in the business, giving as reasons that she had assisted him in carrying on the corporation's activities and desired to have an independent income. Petitioner, in testifying concerning the demands of his wife, said that "* * * she was often after me, she really was after me * * *. That she was entitled to some interest in the business and she should share my interest. * * * And I felt so." He took no conclusive action to satisfy her demands until about December 1, 1940, when he and Methvin *231 concluded that the partnership be formed with the wife of each as partners. The evidence on the point is some proof that petitioner's primary objective in giving his wife an interest in the business was to satisfy her personal wishes alone, including a desire for a source of independent income, to the exclusion of a bona fide business purpose. One motive for the creation of the partnership was the result it would have on tax liability. While a taxpayer may shape his affairs within the limitations of the statute so as to reduce his tax liability, an arrangement for the express purpose of reducing taxes is to be taken into consideration as some evidence of the non-existence of a partnership within the meaning of the revenue act. Among the factors for consideration in determining whether a partnership has reality for tax purposes, and whether the parties in good faith intended partnership, are the origin of the contribution to the partnership, management and control of the business by the wife and whether she contributed vital services. Petitioner concedes that his wife's contribution originated *232 with him. The contribution of property acquired by gift does not, without more, establish a partnership, recognizable for tax purposes. (promulgated January 11, 1950). The evidence here not only proves that the contribution made by petitioner's wife was acquired from him by gift, but shows that the gift was made contingent upon the contribution thereof to the partnership. Evidence of lack of intent of the parties to form, in good faith, a partnership for business purposes, is found in the facts concerning the entries made on the books of the partnership for the accounts of the Goodwater Lumber Co. and the corporation. Among the considerations recited in the instrument executed by the petitioner on December 31, 1940, for the gift to his wife were the advantages that would accrue to the "businesses" (Pine Plume Lumber Co. and Goodwater Lumber Co.) by having his wife as a partner therein, and the agreement of the donee to form a partnership for "said businesses." The partnership agreement executed the same day called for the contribution of no more than the assets of the Pine Plume Lumber Co., and provided that "from such time as the corporation *233 [Goodwater Lumber Co.] shall be dissolved" the business of that corporation should be conducted as a partnership in the name of the Goodwater Lumber Co. No proof was made that the Goodwater Lumber Co. was ever dissolved. The income tax returns of petitioner and his wife for 1941 and 1942 reflect no income from the Goodwater Lumber Co. as a corporation or a partnership. The gift tax return filed by the petitioner for 1941 reported a gift on January 1, 1941, of one-half of his interest in the Pine Plume Lumber Co., a partnership, at a value of $38,117.19, an amount equal to one-fourth of the net worth of the Pine Plume Lumber Co., a corporation, on December 31, 1940, as shown by a balance sheet, adjusted for liquidation purposes, attached to the return. Included among the figures for assets of the corporation was the amount of $31,605.33 for net assets of the Goodwater Lumber Co., but the assets of the latter corporation do not appear in the opening balance sheet of the Pine Plume Lumber Co., a partnership. Other adjustments were made to reduce net worth to $90,942.74, one-fourth of which, or $22,735.68, was credited to the capital account of petitioner's wife as her contribution to *234 the partnership, with the statement that it was "25% of net investment of Pine Plume Lumber Co. at 1-1-1941." No other credits were made to the account for capital contributions by her out of the gift from her husband. No explanation appears in the evidence for adjustments made in the closing balance sheet of the corporation to reduce the book value of the net assets from $152,468.77 to $90,942.74. Among the adjustments was a decrease of about $34,000 in notes and accounts receivable, an increase of about $54,000 in plant and equipment, and an increase of about $74,000 in accounts and notes payable. The indefinite evidence on the assets of the Goodwater Lumber Co., and the adjustments made in the accounts, considered in the light of the understanding between petitioner and his wife when the gift was made, is an element to be taken into account in determining the bona fides of the alleged partnership. The transfer of assets of the Pine Plume Lumber Co. by petitioner to his wife was not only subject to the use thereof as a contribution to the partnership, but the articles of co-partnership executed as part of the whole transaction expressly provided that upon the death of either wife *235 while a partner her share was thereupon to become the property of her husband, without, in effect, working a dissolution of the firm. The provision prevented the wives from having full and complete ownership of the property, and in that respect there was no gift by petitioner of title entirely free of his control. The agreement did not vest similar rights in the wives in the share of their respective husbands. Furthermore, neither wife acquired a right to realize the full value of her share, inasmuch as each of them was obligated to permit her husband to purchase her interest at book value before offering it to others or forcing a liquidation of the partnership. The provisions, especially when viewed in the light of evidence that petitioner's wife had no business experience, and was not assigned any duties to perform and did not perform any services for the partnership, constitute evidence that the parties never intended, in good faith, to take on the rights and obligations of partners for a business purpose. Petitioner's wife had no drawing account and made no withdrawals in 1941, when the partnership had earnings, before salaries of the husbands, of about $82,000, of which her *236 alleged distributive share was about $11,000. In 1942, when the earnings before salaries were about $250,000, of which her alleged share was about $56,000, her withdrawals were $5,230. The withdrawals of Methvin's wife were only $2,300 in 1941 and $4,800 in 1942. Petitioner seeks to justify the lack of withdrawals by his wife in 1941 upon the ground that the business had just emerged from bankruptcy and, as a consequence, the partnership was required to conserve its capital. The asserted ground is refuted by evidence that the other partners withdrew $92,604.56, or about $1,000 in excess of distributable profits before salaries of the husbands. Included in the withdrawals made by petitioner was $22,500 for payments made to Whitstone for the stock purchased from him in 1934. Petitioner informed the accountant for the partnership that his wife assumed one-half of his debt to Whitstone when the partnership was formed and directed him to charge that portion of the amount to her, which was done as of the close of 1941, together with one-half of the remainder of the balance in his account on the theory that at least that much of his other withdrawals were made for her account. We have only *237 the testimony of the accountant to establish the necessity for the adjustment. Opposed to his testimony, on the reason given by petitioner for the adjustment, is testimony given by petitioner without reference to the entries that the stock purchase "was an individual proposition" between him and Whitstone. That testimony is supported by the lack of a recitation in the instrument transferring a share of the corporate assets to petitioner's wife that the transfer was subject to an assumption of part of the Whitstone debt. Without more, we can not find that the wife ever assumed a portion of the debt or that any withdrawals were made by petitioner in 1941 for her account. Other than income tax payments in the amount of $1,952.03, the evidence does not show the amount applied by the wife in 1942 to any of the purposes to which she applied her withdrawals in that year. It is significant that, with a few exceptions, most of the unexplained amounts were used to pay expenses which are normally paid by the husband. That is particularly true of amounts used to pay premiums on insurance covering the life of petitioner, who testified that he could not say "offhand" "How far back that goes * *238 * *." The inference to be drawn from the testimony is that the insurance was in effect before the partnership arrangement was agreed to. Petitioner alleges that his wife was free to withdraw her share of the partnership profits at will. To the contrary, the partnership agreement provides that earnings were not to be withdrawn otherwise than as agreed to by the partners. Petitioner has not shown whether or not the withdrawals made in 1941 and 1942 were pursuant to action taken under that provision. The large difference in amount between the withdrawals of the husband and wives indicates an understanding to limit the economic benefit the latter could derive from their capital contributions. Without some evidence to the contrary, we can not say that there did not exist from the beginning an understanding that the withdrawals of the wives would be limited to a small amount in comparison with those of the husbands regardless of personal needs or financial condition of the business. Our discussion of the first partnership applies in many respects to the successor enterprise, in which only petitioner and his wife had an interest. One alleged fact, stressed by petitioner, is that his wife *239 made a contribution of new capital. The bases for his argument is that she purchased one-half of the interest of the retiring partners and pledged her credit and assets for their full interest under the joint and several liability she and petitioner assumed for the interest of the Methvins. Other than an interest in the assets of the partnership, there is nothing here showing the assets petitioner's wife had at that time. The known assets were acquired by gift from petitioner for contribution to the partnership, and, as already pointed out, were subject to several restrictions, under which he retained economic benefits. Those benefits were part of the new arrangement. Thus, the assets subject to seizure under a judgment for default in payment were not traceable to any new capital invested by the wife. In the event of her death while a partner, her interest became the property of petitioner, but she had no such rights in his interest. Petitioner regards as of much importance the fact that under the contract of purchase his wife was personally liable for the obligations of the previous partnership. The liabilities were assumed by the purchasers in their individual capacities, and *240 not as partners engaged in the operation of a business. Moreover, the debts were offset by assets under the agreement to purchase at book value. The purchase price was paid out of earnings and assets of the business and, since the sales price in excess of the cash payment was payable in installments over a period of two years; there is some indication that the parties intended that the unpaid obligation could and would be met from the operation of the business. The balance due the Methvins at the close of 1943 was carried as a liability of the partnership in the amount of $43,637.88. The fact discloses that the full purchase price was regarded by petitioner and his wife as an obligation of the partnerships. Obviously the acquisition of the interests of the Methvins was not a business transaction of the partnership. Moreover, the deduction of net worth in 1943 in the face of earnings of about $115,000 before making an allowance for petitioner's salary of about $21,000, is some evidence that the enterprise was partially liquidated to pay the debt owed to the Methvins. Petitioner cites several cases, including , and , *241 as supporting his view. Socalled family partnership cases require, as the Court emphasized in the Culbertson case, consideration of all the facts. We have examined the cases relied upon by the petitioner and find that they are distinguishable. Based upon a consideration of all of the facts in the light of the requirements of the Culbertson case, and not considering any objective test, but only the intent of the partners on all the facts, we conclude that the parties never intended petitioner's wife to be a bona fide partner in carrying on the business of the partnerships and that respondent did not err in taxing the income in question to the petitioner. Decision will be entered for the respondent. Footnotes
1. Includes salary.↩